JUDGE CAPRONI

17 CV 2518

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JONATAN LEANDOER HÅSTAD p/k/a YUNG
LEAN,

                 Plaintiffs,

            v.

HIPPOS IN TANKS, LLC, and STEVEN
MACHAT,

                 Defendants.
--------------------------------------------------------X

Case No.: _____

# MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

ADELMAN MATZ P.C.
1173A Second Avenue, Suite 153
New York, New York 10065
Phone: (646) 650-2207
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS .........................................................................................................2

    A.        THE PARTIES' WORKING RELATIONSHIP ..........................................2

    B.        THE PARTIES' RELATIONSHIP BEGINS TO DETERIORATE ...........2

    C.        DEFENDANTS RELEASE THE WARLORD DEMOS WITHOUT AUTHORIZATION OR PERMISSION ......................................................................3

    D.        THE PARTIES' SETTLEMENT AGREEMENT AND RELEASE..........4

    E.        DEFENDANT'S BREACHES OF THE SETTLEMENT AGREEMENT ...................................................................................................6

    F.        DEFENDANTS THREATENED INFRINGEMENT ..............................7

STANDARD OF REVIEW ........................................................................................................8

ARGUMENT ...............................................................................................................................9

    I.        PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS...................9

        1.        DEFENDANTS' ACTIONS WOULD CONSTITUTE COPYRIGHT INFRINGEMENT OF PLAINTIFF'S EXCLUSIVE RIGHTS IN AND TO HIS WORKS ...........................................................................9

        2.        DEFENDANTS' THREATENED ACTIONS WOULD ALSO BE A WILLFUL VIOLATION OF THE PARTIES' SETTLEMENT AGREEMENT ................................................................................................10

    II.        PLAINTIFF WILL SUFFER IRREPARABLE HARM AND BALANCE OF HARDSHIPS TIPS IN PLAINTIFF'S FAVOR...................................................13

i

III.      THE PUBLIC IS SERVED BY THE INJUNCTIVE RELIEF
REQUESTED HEREIN...................................................................................................16

CONCLUSION.....................................................................................................................17

# TABLE OF AUTHORITIES

## Cases

*American Broadcasting Companies, Inc. v. Cuomo,*
  570 F.2d 1080 (2d Cir. 1977) ................................................................................................. 8

*Elrod v. Burns,*
  427 U.S. 347, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976) ......................................................... 15, 16

*Gal v Viacom Intern., Inc.,*
  518 F. Supp. 2d 526 (S.D.N.Y. 2007) ........................................................................................ 9

*Gund Inc. v. SKM Enters., Inc.,*
  2001 WL 125366 (S.D.N.Y. Feb. 14, 2001) ............................................................................. 8

*Harper & Row Publishers, Inc. v. Nation Enters.,*
  471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) ......................................................... 15

*HarperCollins Publishers L.L.C. v Gawker Media LLC,*
  721 F. Supp. 2d 303 (S.D.N.Y. 2010) ................................................................................ 8, 9, 14

*In re Feit & Drexler, Inc.,*
  760 F.2d 406 (2d Cir.1985) ...................................................................................................... 9

*K. Bell & Assoc., Inc. v Lloyd's Underwriters,*
  827 F. Supp. 985 (S.D.N.Y. 1993) ......................................................................................... 10

*Maldonado v Valsyn, S.A.,*
  390 Fed. Appx. 27 (2d Cir. 2010) ......................................................................................... 12

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.,*
  312 F.3d 94 (2d Cir. 2002) ................................................................................................. 8, 14

*Nature's Enters., Inc. v. Pearson,*
  2008 WL 4700547 (S.D.N.Y. Oct. 24, 2008) ......................................................................... 8

*Nolan v. Sam Fox Publ'g. Co.,*
  499 F.2d 1394 (2d Cir. 1974) ............................................................................................. 12, 13

*Omega Importing Corp. v. Petri–Kine Camera Co.,*
  451 F.2d 1190 (2d Cir. 1971) .............................................................................................. 14

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
  475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) .............................................................. 16, 17

iii

*Powlus v Chelsey Direct, LLC*, 09 CIV 10461 PKC,
  2011 WL 135822 (S.D.N.Y. Jan. 10, 2011)..................................................................... 13

*Reckitt Benckiser Inc. v. Motomco Ltd.*,
  760 F. Supp. 2d 446 (S.D.N.Y. 2011)............................................................................ 8

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010)................................................................................Passim

*Warner Bros. Inc. v. Dae Rim Trading, Inc.*,
  877 F .2d 1120 (2d. Cir. 1989)....................................................................................... 8

*Wheaton v. Peters*,
  U.S. (8 Pet.) 591, 8, 8 L.Ed. 1055 (1834) ................................................................... 15

**Statutes**

17 U.S.C. 502(a) ..................................................................................................................... 9

17 U.S.C. § 106........................................................................................................................ 15

**Rules**

Fed. R. Civ. P. 65.................................................................................................................... 8

## PRELIMINARY STATEMENT

Jonatan Leandoer Håstad p/k/a Yung Lean ("Håstad"), a well-known hip-hop recording and performing artist, brings this motion for a temporary restraining order and preliminary injunction to prevent Hippos In Tanks, LLC ("HIT") and Steven Machat ("Machat") (collectively "Defendants"), as well as any person(s) acting on their behalf, from committing intentional acts of copyright infringement and willful breaches of the written settlement agreement between Håstad and HIT, by releasing and distributing Håstad's sound recordings and videos, without authorization or permission.

The parties to this action are not strangers.  After a brief informal working relationship, through which Defendants gained access to and copies of Håstad's recordings and videos (both released and unreleased versions) the parties' relationship ended in acrimony.  In early 2016, after Defendants had previously released a group of Håstad's unfinished demos without permission, the parties negotiated a settlement agreement and release, which confirmed that HIT had no copyright ownership in, or other rights to, Håstad's work and confirmed that HIT "shall never again distribute, exploit, license or grant any person or entity the right to distribute, exploit or license any recordings embodying the performances of [Håstad]".

Now, in a direct and willful violation of the parties written Settlement and Release Agreement dated March 1, 2016, Defendants have threatened to release and distribute several of Håstad's recordings and videos on April 8, 2017.

As set forth herein, to prevent the immediate and irreparable harm that Håstad would suffer if Defendants released these recordings, Håstad requires an immediate temporary restraining order and a preliminary injunction to prevent Defendants' threatened conduct which is a clear infringement of Håstad's exclusive rights under the Copyright Act and a violation of the parties' written settlement agreement.

## STATEMENT OF FACTS

### A.  The Parties' Working Relationship

Håstad is a world famous Swedish hip-hop artist who resides in Stockholm.  *See* Declaration of Jonatan Håstad dated April 6, 2017 ("Håstad Decl.") ¶3.  Håstad made his large debut in 2013 when he released his mixtape entitled *Unknown Death* along with many singles on YouTube, including *Ginseng Strip 2002, Kyoto* and *Hurt*.  *See* Håstad Decl., ¶4.  Håstad first became acquainted with Defendant Machat in 2014.  *See* Håstad Decl., ¶5.  Machat together with his son Barron Machat ran a record label called Hippos in Tanks, LLC ("HIT").  *See id.*  After discussions regarding working together and releasing music through HIT, without any written agreements between the parties, Håstad and Defendants began working together.  *See* Håstad Decl., ¶6.  In early fall of 2014, without any written agreement or advances, Håstad released the album *Unknown Memory*, which was released on HIT's label and distributed through Redeye Distribution.  *See* Håstad Decl., ¶7.

Around that time in 2014, Håstad was on an international tour that included dates in the United States (including New York).  *See* Håstad Decl., ¶8.  In late 2014 and early 2015, Håstad continued touring in various locations in the United States and other cities around the world, shooting music videos and recording his new album.  *See* Håstad Decl., ¶¶8-9.

### B.  The Parties' Relationship Begins to Deteriorate

In April of 2015, Håstad's external hard drive which contained copies of Håstad's prior works and unfinished works including demos of songs that were being recorded for Håstad's next album *Warlord*, was in Miami with Håstad, where he was recording and shooting videos.  *See* Håstad Decl., ¶9.  Barron Machat was also in Miami.  On the night of April 8, 2015, Barron Machat, was in a car accident and died.  *See id.*  Shortly after the car accident Håstad returned home to Sweden.  *See* Håstad Decl., ¶10.  Håstad's external hard drive had been inadvertently left

2

in Miami and was taken by Defendants after Barron's death, and not returned to him until May of 2015.  *See* Håstad Decl., ¶¶9-10.

In July of 2015, Håstad began asking Machat and HIT for accountings of the monies that HIT was collecting from the exploitation of Håstad's work including *Unknown Memory*.  *See* Håstad Decl., ¶¶11-12.  In September, Håstad's managers and Machat met in London to discuss the outstanding accounting issues.  *See* Håstad Decl., ¶13; Ekman Decl., ¶¶4-5.  At that meeting Machat promised to provide an accounting.  *See* Ekman Decl., ¶5.  Following that meeting on or around September 29, 2015, Machat sent Håstad a document entitled Financial Guestimates, which appeared to be a largely incomplete, unfinished estimate of revenue received for certain works, including *Unknown Memory*.  *See* Ekman Decl., ¶5.  When Håstad asked for proper accountings, the relationship between the parties quickly began to deteriorate. *See* Ekman Decl., ¶6.

### C.  Defendants Release the Warlord Demos Without Authorization or Permission

Despite Håstad's efforts to find an amicable solution to the situation that was quickly escalating between the parties, no such accounting was forthcoming.

In January of 2016, Håstad announced the upcoming release of the album *Warlord*, which he anticipated releasing in February of 2016 and a corresponding world tour.  *See* Håstad Decl., ¶15; Ekman Decl., ¶8.  Given the issues between the parties, including Defendants' failure to properly account to Håstad and the hostile relationship between Håstad and Defendants, Håstad planned to self-release *Warlord*, and was not planning to release *Warlord* through HIT.  *See* Håstad Decl., ¶¶14-15; Ekman Decl., ¶8.

On January 23, 2016, Håstad discovered an unauthorized pre-order for an album purportedly called "Warlord - In Memory of Barron Alexander Machat" on Amazon.com, with cover art consisting of a drawing by a street artist that had also been left in Miami with Håstad's

external hard drive.  *See* Håstad Decl., ¶16; Ekman Decl., ¶9.  It further appeared based on the song titles that the unauthorized pre-order of *Warlord* that was found online consisted of the demo recordings that had been recorded in early 2015 prior to Barron Machat's death—notably the pre-order said it copyrighted by "Hippos In Tanks - A division of the Machat Corporation".  *See* Håstad Decl., ¶16; Ekman Decl., ¶9.  Upon information and belief, Defendants copied these demos from Håstad's external hard drive prior to returning it to Håstad.  *See* Håstad Decl., ¶17.

Thereafter on January 25, 2016, without Håstad's authorization or permission HIT released the demo recordings of *Warlord*.  *See* Håstad Decl., ¶18; Ekman Decl., ¶10.  Håstad immediately demanded that the demos be taken down.  *See* Håstad Decl., ¶18; Ekman Decl., ¶10.  While Håstad was able to get the demo's taken down after 2-3 days the damage to the release schedule had been done.  *See id.*  Additionally, the demos of *Warlord* were not finalized and were not of the quality that was intended for the release, which further caused damage to Håstad's reputation. *See* Håstad Decl., ¶18.

When Defendants were confronted about their unauthorized release of the *Warlord* demos Machat presented a forged contract purportedly dated October 11, 2014, and an alleged term beginning on June 25, 2014 claiming rights to Håstad's recordings that were delivered during the term (the "Forged Agreement").   *See* Håstad Decl., ¶19; Ekman Decl., ¶11.  However, Håstad had never signed any such agreement, nor had he ever signed any agreement giving either of the Defendants ownership or other rights in and to any of his works.  *See* Håstad Decl., ¶19.

D.  **The Parties' Settlement Agreement and Release**

In February of 2016, in an effort to resolve the parties' disputes, Håstad's representatives met with Machat in New York. *See* Ekman Decl., ¶12. After several hours, the parties were able to reach an agreement, and on March 7, 2016, executed the Settlement and Release Agreement (the "Settlement Agreement").  *See* Håstad Decl., ¶20, Ex. 1; Ekman Decl., ¶12.

4

Among other terms, the Settlement Agreement provided for the termination of various agreements, including that: (i) the purported Forged Agreement and any other agreements between the Håstad and HIT were terminated *ab initio*; (ii) HIT's rights and interest, if any, in and to all Other Agreements were terminated, including, HIT's rights and/or interests in and to the Redeye Agreement[1], the exclusive merchandising agreement with Dreamer Media ("Dreamer Agreement"), the online monetization agreement with Base79/Righster ("Base79 Agreement") and all agreements with respect to Håstad's touring and live performance activities, including, without limitation, with the Windish Agency agreement ("Performance Agreements").  *See* Håstad Decl., Ex. 1, ¶1.

The Settlement Agreement further provided that HIT would provide Håstad with copies of all statements which were received in connection with the Redeye Agreement, Dreamer Agreement, Base79 Agreement and all Performance Agreements and copies of all master recordings, hard drives, mixes, demonstration recordings and other materials concerning the recorded performances of Håstad, and would immediately destroy any duplicate or additional copies of same which may be in HIT's possession.  *See* Håstad Decl., Ex. 1, ¶4(b).  HIT further agreed that it would never again distribute, exploit, license or grant any person or entity the right to distribute, exploit or license any recordings embodying the performances of Håstad.   *See* Håstad Decl., Ex. 1, ¶4(c).

Provided HIT was not in breach of the Settlement Agreement Håstad agreed to make certain payments to HIT, as set forth therein, including $15,000 following the execution of the Settlement Agreement.  *See* Håstad Decl., Ex. 1, ¶2(a).  Thereafter, also provided HIT was not in

---

[1] As set forth in the Settlement Agreement, HIT warranted and represented that it had entered into a distribution agreement with Redeye Distribution for the distribution of certain previously existing materials, including *Unknown Memory*.  *See* Håstad Decl., Ex. 1, ¶2(f).

breach of the Settlement Agreement, for a limited period of time, Håstad agreed to pay certain percentages of the gross monies received in connection with certain materials, including *Unknown Memory* and *Warlord*, as set forth in the Settlement Agreement. *See* Håstad Decl., Ex. 1, ¶2(b).

As part of the Settlement Agreement, HIT represented and warranted that the Redeye Agreement, under which HIT had granted Redeye exclusive rights would expire on June 30, 2016. The Settlement Agreement provided that, HIT would account to and pay Håstad his share of the monies received from Redeye as set forth in the Settlement Agreement. *See* Håstad Decl., Ex. 1, ¶2(f).

Following the execution of the Settlement Agreement, Håstad paid HIT fifteen thousand dollars ($15,000).  *See* Håstad Decl., ¶21.

E.  **Defendant's Breaches of the Settlement Agreement**

Following the execution of the Settlement Agreement and Håstad's payment to HIT, HIT failed to live up to its obligations under the agreement, including but not limited to by failing to account to and pay Håstad his share of the monies received by Redeye, by failing to return Håstad's master recordings to him, and, as is apparent now, by failing to delete duplicate copies of materials concerning the recorded performances of Håstad. *See* Håstad Decl., ¶22; Ekman Decl., ¶13.

On or about December 5, 2016, after months of failing to make payments or deliver accountings to Håstad, as required by the Settlement Agreement, Håstad's representatives sent a breach notice to Defendants notifying Defendants of those breaches.  *See* Koby Decl., Ex. 1.  The breach letter further notified Defendants that it was Håstad's position that Defendants' had further breached the Settlement Agreement by misrepresenting the date that the Redeye Agreement would expire on June 30, 2016, when apparently, the Redeye Agreement terminates long after that date. *See* Koby Decl., Ex. 1.

6

### F.   Defendants Threatened Infringement

On or about March 17, 2017, Defendants' attorney, contacted Håstad's exclusive distributor Kobalt and falsely claimed Håstad had breached the Settlement Agreement between the parties. *See* Koby Decl., Ex. 2.  Defendants further falsely claimed that "[s]ince his breach of the agreement abrogates Hastad's right to control his recordings, we hereby demand that Kobalt remove any and all Yung Lean, and Young [sic] Lean related, recordings from all sales channels immediately."  *See* Koby Decl., Ex. 2.

Defendants went on to advise that they would be "re-releasing all of its Yung Lean recordings (including the unreleased mix tape) on April 8, 2017." *See* Koby Decl., Ex. 2.

Following conversations between counsel, Defendants attorney again emailed on April 5, 2017, stating that Defendants would be releasing *Unknown Death, Unknown Memory, Warlord,* an "unreleased mixtape" and a video of Plaintiff. *See* Adelman Decl., Ex. 1.

Contrary to Defendants' statements in the March 17, 2017 email, pursuant to the Settlement Agreement, the termination of all alleged agreements pursuant to which HIT claimed rights were unconditionally terminated, and HIT unconditionally confirmed that Plaintiff was the sole owner of any recordings embodying Plaintiff's performance.  *See* Håstad Decl., Ex. 1. Further contrary to Defendants' contentions, HIT unconditionally promised that it "shall never again" distribute any of Plaintiff's works.  *See* Håstad Decl., Ex. 1, ¶4(c).

As set forth herein, Defendants have no right to publish or distribute any of the recordings or videos embodying Håstad's performances, whether released previously or not.  As such, Plaintiff seeks the instant temporary restraining order and preliminary injunction to enjoin Defendants from releasing and/or distributing Håstad's performances, which would not only be deliberate and willful acts of copyright infringement violating Håstad's rights to distribution

and/or first publication (for the unpublished mix tapes), causing irreparable harm to Håstad, but would also willfully breach the parties' Settlement Agreement.

## STANDARD OF REVIEW

In the Second Circuit, a court may issue a preliminary injunction in a copyright action pursuant to Fed. R. Civ. P. 65(a) if the plaintiff demonstrates: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiffs favor"; (2) "that he is likely to suffer irreparable injury in the absence of an injunction"; (3) "the balance of hardships tips in the plaintiffs favor;" and (4) the "public interest would not be disserved" by the issuance of a preliminary injunction. *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal citation and quotations omitted). *See also Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446,451 (S.D.N.Y. 2011); *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96, 100 (2d Cir. 2002) (affirming preliminary injunction in copyright action); *Nature's Enters., Inc. v. Pearson*, No. 08 Civ. 8549 (JGK), 2008 WL 4700547, at * 3 (S.D.N.Y. Oct. 24, 2008) (granting preliminary injunction in copyright action); *Gund Inc. v. SKM Enters., Inc.*, No. 01 CIV 0882 (CSH), 2001 WL 125366, at *1-2 (S.D.N.Y. Feb. 14, 2001) (noting prior grant of temporary restraining order and granting preliminary injunction).

A temporary restraining order is a short-term protective device authorized under Rule 65 of the Federal Rules of Civil Procedure. Its purpose is to protect a party from irreparable harm until more lasting relief, such as a preliminary injunction, can be sought. *HarperCollins Publishers L.L.C. v Gawker Media LLC*, 721 F. Supp. 2d 303, 305 (S.D.N.Y. 2010) (*citing e.g. American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977)); *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F .2d 1120, 1125 (2d. Cir. 1989) ("[t]he purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass

8

upon the merits of the demand for a preliminary injunction.") (internal citation and quotation omitted).

"Courts in this circuit have required plaintiffs seeking a temporary restraining order to show (1) either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the [applicant's] favor;' and (2) the likelihood of irreparable harm in the absence of such an order." *HarperCollins Publishers L.L.C.*, 721 F Supp 2d at 305 (quoting *In re Feit & Drexler, Inc.*, 760 F.2d 406, 415 (2d Cir.1985)).

Further, pursuant to the Copyright Act itself, a court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. 502(a).

ARGUMENT

I.      PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

There is no question that Plaintiff is likely to succeed on the merits of its claims in this action, nor is there any question that Plaintiff is entitled to immediate injunctive relief.

1.   **Defendants' Actions Would Constitute Copyright Infringement of Plaintiff's Exclusive Rights in and to His Works**

Plaintiff is likely to succeed on its claim of copyright infringement. "In order to prevail on a copyright infringement action, a plaintiff must prove: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Gal v Viacom Intern., Inc.*, 518 F. Supp. 2d 526 (S.D.N.Y. 2007).

Here there is no dispute that Håstad is the owner of his works, including but not limited to *Unknown Death* (2013), *Unknown Memories* (2014) and *Warlord* (2015) (both the final versions and the demos) as the parties Settlement Agreement confirmed Håstad's ownership of same. *See*

9

Håstad Decl., Ex. 1, ¶2(e) (HIT "acknowledges and agrees that all master recordings, musical compositions, merchandise and other rights . . . are the sole and exclusive property of [Plaintiff]").

Furthermore, Plaintiff will succeed on the second element of this claim.  Absent an injunction, Defendants will violate Plaintiff's exclusive rights by distributing and/or authorizing the distribution of Håstad's works.  In addition, Defendants would violate Plaintiff's right to first publication of the *Warlord* demos (or other unpublished works that Defendants possess such including what Defendants referred to as the "unreleased mixtape") by releasing them publicly without authorization or permission from Plaintiff.[2]

2.  **Defendants' Threatened Actions Would Also Be A Willful Violation of the Parties' Settlement Agreement**

In the alternative, it is similarly without question that, Plaintiff would also succeed on its claim for breach of contract with respect to Defendants' threatened actions.[3]

To prevail on a contract claim, a Plaintiff must prove: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach. *See K. Bell & Assoc., Inc. v Lloyd's Underwriters*, 827 F. Supp. 985, 988 (S.D.N.Y. 1993).

---

[2] Defendants' previously released the *Warlord* demos without authorization or permission, and those demos were subsequently taken down.  However, a defendant's unauthorized dissemination of plaintiff's unpublished work does not constitute "publication".  *See e.g.* 1 Nimmer on Copyright § 4.03.

[3] Plaintiff's Complaint asserts a breach of contract claim for all damages associated with HIT's breaches of the Settlement Agreement, including but not limited to HIT's failure to account to and pay Plaintiff monies received from Redeye, as required by the Settlement Agreement, and for damages related to HIT's intentional misrepresentations in connection with the term of the Redeye Agreement.  For the purposes of this application, Plaintiff shall only address HIT's breaches of the agreement that are relevant to Plaintiff's request for a temporary restraining order and preliminary injunctive relief, however Plaintiff reserves its rights to pursue all damages available to it as a result of HIT's breaches whether at law or in equity during the pendency of the instant action.

In this case, there is a valid written agreement between Plaintiff and HIT, pursuant to which it was agreed that all prior alleged agreements between the parties (including the Forged Agreement) were terminated, and Defendants' confirmed that HIT had "no further rights . . . under the Alleged [Forged] Agreement, Other Agreements or Otherwise".  *See* Håstad Decl., Ex. 1, ¶1.

HIT further confirmed that notwithstanding the alleged Forged Agreement and Other Agreements, that it:

> acknowledges and agrees that all master recordings, musical compositions . . . and other rights which were granted or purported to have been granted by [Plaintiff] to [HIT] pursuant to the Alleged [Forged] Agreement or Other Agreements (including, but not limited to, all master recordings embodying the performances of [Plaintiff], Yung Gud, Yung Sherman, Thaiboy Digital, Sad Boys, Gravity Boys [each, an "Affiliated Person"] . . . are the sole and exclusive property of [Plaintiff] (or the Affiliated Person, as applicable), free from any claims by [HIT] or any other person, and [HIT] hereby assigns to [Plaintiff] (or the Affiliated Person, as applicable), on a quitclaim basis, all right, title and interest in and to all copyrights and other rights obtained and/or acquired by Company under the Alleged [Forged]  Agreement or Other Agreements.

*See* Håstad Decl., Ex. 1, ¶2(e).

In addition to the above, HIT agreed that it "shall never again" distribute, exploit, license or grant any person or entity the right to distribute, exploit or license any recordings embodying the performances of Håstad.  *See* Håstad Decl., Ex. 1, ¶4(c).

Plaintiff duly performed under the Settlement Agreement, including but not limited to by paying HIT the $15,000 due following the execution of the Settlement Agreement.  *See* Håstad Decl., ¶21.

In addition to HIT's failure to provide accountings and payments to Plaintiff, here, the mere fact that Defendants' continue to possess copies of recordings embodying Håstad's performances whether audio, visual or audiovisual, whether released or unreleased, they are in breach of their obligation to return all such works to Håstad and destroy any duplicates.  *See* Håstad Decl., Ex. 1, ¶4(b).  Moreover, any release of any of Plaintiff's works, including but not

11

limited to *Unknown Death, Unknown Memory, Warlord,* an "unreleased mixtape" and a video of Plaintiff ("Plaintiff's Works") would not only infringe Plaintiff's exclusive rights therein, as set forth above, but would be a clear violation of the Settlement Agreement. *See* Håstad Decl., Ex. 1, ¶4(c).

Contrary to Defendants' statements in the recent emails from their attorney, none of the provisions confirming (i) the termination of all of HIT's alleged rights with respect to Plaintiff's Works; (ii) that Plaintiff is the sole and exclusive owner of all of his Works; or (iii) that HIT would *never again* distribute any recordings embodying the performances of Håstad, were conditional. Nor contrary to Defendants' attorneys claim that Plaintiff's alleged breach of the agreement "abrogates Hastad's right to control his recordings". Simply put there is no condition to the termination of HIT's alleged rights. *See* Håstad Decl., Ex. 1.

Moreover, while Plaintiff denies any breach of the Settlement Agreement, even an alleged breach here does not void the Settlement Agreement. Plaintiff performed under the Settlement Agreement making the $15,000 payment as required. *See* Håstad Decl., ¶21. Any further payments due by Plaintiff were *expressly premised* on HIT not being in breach of the Settlement Agreement, which it has been since it signed the Settlement Agreement, *inter alia,* due to the fact that it never deleted the very materials it was required to delete, which it is now threatening to release, and its misrepresentations concerning the term of the Redeye Agreement. Plaintiff has no further obligations to Defendants, as HIT has been and remains in material breach of the Settlement Agreement. *See* Håstad Decl., ¶¶22-23. However, even if HIT could prove that Plaintiff was under an obligation and failed to make payments to it, which it cannot, recession would not even be available to HIT.

Controlling law in this Circuit is clear that "'rescission of a contract is an extraordinary remedy.' Where there is an adequate remedy at law, i.e., money damages, then a party is not

12

entitled to the equitable remedy of rescission." *Maldonado v Valsyn, S.A.*, 390 Fed. Appx. 27 (2d Cir. 2010) (quoting *Nolan v. Sam Fox Publ'g. Co.*, 499 F.2d 1394, 1397 (2d Cir. 1974)).  Under New York law, as confirmed by the Second Circuit, even if a party fails to make *some* payments under an agreement, that does not justify rescission.  *Nolan*, 499 F2d at 1399 (payment of 26% of royalties due under a licensing agreement not a material breach to justify rescission).

Nothing in the Settlement Agreement provides any rights to Plaintiff's Works to Defendants or a mechanism for voiding the termination of those rights.  *See also Powlus v Chelsey Direct, LLC*, 09 CIV 10461 PKC, 2011 WL 135822, at *6 (S.D.N.Y. Jan. 10, 2011) ("Where the contract lacks an automatic rescission provision, rescission requires an affirmative act.").   Even if Defendants' believe that Plaintiff has breached the Settlement Agreement, which he has not, their remedy is for breach of contract—but they do not have the right to simply release Plaintiff's Works.

Further evidencing that Defendants position is baseless, Defendants have threatened to release and distribute *Unknown Death* (Plaintiff's 2013 mixtape) that was created and released before Plaintiff even met Defendants, and was never subject to Defendants fraudulent claims that they owned rights in Plaintiff's recordings pursuant to the Forged Agreement.

Defendants have no right or authority to release, distribute, or otherwise exploit any of Plaintiff's Works, and as such should be immediately enjoined from doing so.

II.     **PLAINTIFF WILL SUFFER IRREPARABLE HARM AND BALANCE OF HARDSHIPS TIPS IN PLAINTIFF'S FAVOR**

Plaintiff will suffer irreparable harm in the absence of an injunction and a temporary restraining order and the balance of the hardships clearly weighs in Plaintiff's favor.  As noted by the Second Circuit, these "two items, both of which consider the harm to the parties, are related." *Salinger v Colting*, 607 F. 3d. 68, 81 (2d Cir. 2010).

13

On the issue of irreparable harm, Courts must "actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *HarperCollins Publishers L.L.C. v Gawker Media LLC*, 721 F. Supp. 2d 303, 305 (S.D.N.Y. 2010) (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)).

The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction. The plaintiff's interest is, principally, a property interest in the copyrighted material. *See Salinger v Colting*, 607 F.3d 68, 81 (2d Cir. 2010).

The Second Circuit has further noted that "[h]arm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger v Colting*, 607 F.3d 68, 81 (2d Cir. 2010).

"In the context of copyright infringement cases, the harm to the plaintiff's property interest has often been characterized as irreparable in light of possible market confusion." *Salinger v Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (citing *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.,* 312 F.3d 94, 96–97 (2d Cir. 2002)).

Courts have tended to issue injunctions in this context because "to prove the loss of sales due to infringement is ... notoriously difficult." *Salinger v Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (citing *Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971)).

Here Defendants' release and distribution of Plaintiff's previously published works would irreparably harm Plaintiff by creating market confusion, for which monetary damages would be impossible to quantify.  Having Plaintiff's works available from two different sources would without doubt create market confusion for both consumers and distributors, and indeed could lead

14

to Plaintiff's legitimately distributed work being taken down.  *See* Håstad Decl., ¶25-26; Ekman Decl., ¶¶16-17.  Such an effect would absolutely cause irreparable harm to Plaintiff as it could permanently lose rankings and play count totals on digital distribution platforms, which have the effect of higher placement of Plaintiff's works on these platforms to consumers and thus drive sales.  Such a disastrous outcome would absolutely cause lost sales, which would be impossible to quantify. *See* Håstad Decl., ¶25-26; Ekman Decl., ¶¶16-17.

In addition, Defendants' exploitation would interfere with Plaintiff's existing exclusive distribution agreements with third parties, including Kobalt.  *See* Håstad Decl., ¶27; Ekman Decl., ¶18.  Indeed, to this end Defendants' communications to Kobalt and Plaintiff threatening to release Plaintiff's work seems to be intended to interfere with Plaintiff's contractual and business relations.

Defendants also are in possession of demo tapes and have threatened to distribute some of these "unreleased works", which would further cause irreparable harm to Plaintiff.

Copyright law provides to the author the right to first publication, thus allowing the author to suppress publication. *See* 17 U.S.C. § 106.  Additionally, as the Supreme Court has suggested, a copyright holder might also have a First Amendment interest in *not* speaking.'' *Salinger*, 607 F3d at 81 (citing *Wheaton v. Peters,* 33 U.S. (8 Pet.) 591, 661, 8 L.Ed. 1055 (1834); *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 559, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)). "The loss of First Amendment freedoms," and hence infringement of the right *not* to speak, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Salinger*, 607 F3d at 81 (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976)).

Here Defendants have expressly threatened to release Plaintiff's "unreleased" works, in an attempt to intentionally damage Plaintiff.  Defendants have done this before when they released Plaintiff's demo versions of *Warlord* in early 2016.   A release of Plaintiff's unpublished works

15

would not only violate the Settlement Agreement, but would further violate Plaintiff's exclusive right to first publication and its right to *not* publish certain works.  Releasing Plaintiff's unpublished works would absolutely cause irreparable harm to Plaintiff. Once they have been released, there will likely be no taking them back and Plaintiff will be forever deprived of his right to choose if, how and when to release the unpublished works.  *See* Håstad Decl., ¶¶30-31; Ekman Decl., ¶19.  Moreover, any future value that Plaintiff could garner for an exclusive or marketed release these unpublished works would be forever destroyed and impossible to quantify.  *See id.*

Defendants on the other hand will suffer no hardship by being enjoined from releasing and exploiting Plaintiff's Works.  Defendants have no rights (copyright or contractual) to exploit Plaintiff's Works.  *See* Håstad Decl., ¶32.  Defendants' only reason for claiming they should be able to exploit Plaintiff's Works is because they claim Plaintiff has breached the Settlement Agreement.  While Plaintiff disputes that these payments are due to HIT, *at best* Defendants have a claim with an adequate remedy at law.  However, Defendants will not suffer any hardship by being enjoined from taking and exploiting Plaintiff's Works without permission or authorization.

As such the balance of the hardships in this case also decidedly tips in Plaintiff's favor.

## III.    THE PUBLIC IS SERVED BY THE INJUNCTIVE RELIEF REQUESTED HEREIN

Additionally, the public interest is served from the issuance of a temporary restraining order and a preliminary injunction. As noted by the Second Circuit in *Salinger,* the "object of copyright law is to promote the store of knowledge available to the public" and to the extent that goal is met by providing financial incentives, "the public's interest may well be already accounted for by the plaintiff's interest." 607 F.3d at 82.

The public's interest in free expression, however, is significant and is distinct from the parties' speech interests. *See id.*  "By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving

information." *Id.* (quoting *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,* 475 U.S. 1, 8, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986)). The Second Circuit has further noted however, that every "injunction issued before a final adjudication on the merits risks enjoining speech protected by the First Amendment. Some uses, however, will so patently infringe another's copyright, without giving rise to an even colorable . . . defense, that the likely First Amendment value in the use is virtually nonexistent." *See id.*

Here the public's interest is served by protecting Plaintiff's rights in and to controlling the distribution and exploitation of his Works.  Enforcing Plaintiff's exclusive rights under the Copyright Act and Plaintiff's rights under the Settlement Agreement, encourages artists like Plaintiff to realize value in their work and incentivizes artists to continue creating new works because of that value.

Additionally given that Defendants' have no colorable defenses, the public interest is served by the injunctive relief requested.

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully request that the Court grant Plaintiff's motion for a temporary restraining order and preliminary injunction and enjoin Defendants, and anyone acting under their control, from releasing, distributing, or otherwise exploiting any of Plaintiff's Works, whether published or unpublished.

Dated: New York, New York
     April 7, 2017

Respectfully submitted,
ADELMAN MATZ P.C.

By: 
    Sarah M. Matz, Esq.
    Gary Adelman, Esq.
1173A Second Avenue, Suite 153
New York, New York 10065
Tel: (646) 650-2207
Email: sarah@adelmanmatz.com
Email: g@adelmanmatz.com
*Attorneys for Plaintiff*

17